CHAD S. HUMMEL (Bar No. CA 139055)
E-mail: chummel@manatt.com
SHARI MULROONEY WOLLMAN (Bar No. CA 137142)
E-mail: swollman@manatt.com
ERIN C. WITKOW (Bar No. CA 216994)
E-mail: ewitkow@manatt.com
MANATT, PHELPS & PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

FILED
2013 JUN 26 PM 12: 35
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

*Attorneys for Plaintiff*
IMAX CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IMAX CORPORATION, a Canadian Corporation,

Plaintiff,

vs.

GDC TECHNOLOGY (USA) LLC, a California Limited Liability Company; GDC TECHNOLOGY LIMITED, a British Virgin Islands company; GDC TECHNOLOGY LIMITED, a Cayman Islands company,

Defendants.

No. CV13-04640-DDP (MRWx)

**COMPLAINT FOR:**

**TRADE SECRET MISAPPROPRIATION PURSUANT TO CAL. CIV. CODE § 3426, *et seq.* AND COMMON LAW;**

**UNJUST ENRICHMENT;**

**UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 *et seq.***

**DEMAND FOR JURY TRIAL**

Plaintiff IMAX Corporation ("IMAX") states the following for its Complaint against Defendants GDC Technology (USA), LLC, GDC Technology Limited (BVI), and GDC Technology Limited (Cayman) (collectively, "GDC" or "Defendants").

**NATURE OF THE CASE**

1. IMAX has filed this action to stop GDC's illegal commercial exploitation of IMAX's trade secret large format digital theatre projection system and film conversion technologies. Former IMAX employee, Gary Tsui, stole this proprietary technology from IMAX, then surreptitiously provided it to film companies in China, including a company now called China Giant Screen, for which he is the "Chief Engineer." China Giant Screen uses IMAX's trade secrets under the name "China Film Giant Screen" ("CFGS"). Defendant GDC is now knowingly and actively using IMAX's trade secrets through, among other things, its relationship with CFGS, in its efforts unfairly to compete globally with IMAX.

2. Prior to this filing, IMAX delivered an unambiguous cease and desist letter to GDC which was ignored. Indeed, GDC is actively touting its CFGS-based large format film projection systems and conversion technology that, as described herein, IMAX is informed and believes were derived from and incorporate the trade secrets stolen by Tsui. Significantly, as a part of its current Initial Public Offering ("IPO"), GDC has stated that its large format film technologies are dependent on CFGS and that IPO proceeds will be used for "geographical expansion to existing and new markets, research and development including on our new business initiatives such as private digital cinema and China Film Giant Screen." Unabated, Defendants will be the knowing participants in this high tech piracy, to their financial benefit and IMAX's detriment.

3. The illegal activities at issue here began several years ago. In 2009, IMAX discovered that Tsui had stolen its proprietary and trade secret information relating to IMAX's core projection and conversion technologies, including software

source code. While employed by IMAX, but unbeknownst to it, Tsui formed his own company in competition with IMAX, and used IMAX's trade secrets to compete against – and beat out – IMAX on a bid for a significant project in China.

4. Following Tsui's trail from Ontario, Canada to Beijing, China (and now to Los Angeles), IMAX conducted its own investigations into Tsui's activities and, after finding incriminating information, IMAX initiated lawsuits against Tsui in both Canada and China. Through those suits, IMAX uncovered voluminous, conclusive proof of Tsui's retention and theft of IMAX's confidential and proprietary trade secrets, including CDs containing the source code for IMAX's 2D/3D conversion process and re-mastering technology, as well as the repeated use of IMAX's trade secrets to form companies in Canada and China in direct competition with IMAX. Based on that evidence, IMAX has obtained extraordinary relief from two foreign tribunals, including a rarely granted, multi-site search and seizure order, a contempt order, and ultimately an arrest warrant issued by the Canadian court, and a broad search and seizure order issued by the Beijing court and executed by several Chinese judges. Tsui remains an international fugitive, and his plan to profit unlawfully from the technology stolen from IMAX has now touched U.S. soil with Defendant GDC's efforts to market CFGS with the benefit of public funding.

**PARTIES**

5. Plaintiff IMAX Corporation ("Plaintiff") is a Canadian corporation having a principal place of business located at 2525 Speakman Drive, Sheridan Science and Technology Park, Mississauga, Ontario, Canada L5k 1B1.

6. Upon information and belief, Defendant GDC Technology (USA), LLC is a California limited liability company having a principal place of business located at 1016 W. Magnolia Blvd., Burbank, California 91506. Upon information and belief, GDC Technology (USA), LLC is a wholly-owned subsidiary of GDC Technology Limited, a company incorporated in the British Virgin Islands.

7. Upon information and belief, GDC Technology Limited, is a company incorporated in the British Virgin Islands, with its principal place of business located at Unit 1-7, 20th Floor, Kodak House II, 39 Healthy Street East, North Point, Hong Kong.

8. Upon information and belief, GDC Technology Limited, is a company incorporated in the Cayman Islands, with its principal place of business located at Unit 1-7, 20th Floor, Kodak House II, 39 Healthy Street East, North Point, Hong Kong.

## JURISDICTION AND VENUE

9. This Court has jurisdiction under 28 U.S.C. § 1332(a)(2), as this dispute is between a citizen of a foreign state, on the one hand, and citizens of the State of California and of differing foreign states, on the other hand, and the amount of IMAX's claims exceed the sum or value of $75,000, exclusive of interests and costs.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that Defendant GDC does business in this judicial district and/or a substantial part of the events giving rise to IMAX's claims occurred in this judicial district.

## FACTUAL BACKGROUND

### Background Regarding IMAX and Its Technologies

11. IMAX is one of the world's leading entertainment technology companies, with a particular emphasis on film and digital imaging technologies, including 3D, post production and digital projection. For almost 40 years, IMAX has been a pioneer and provider of immersive motion picture technologies, including large format ("LF") projection systems, as well as the technology of converting 2D images and motion pictures to 3D images and motion pictures ("2D to 3D Conversion"), and the Digital Media Re-Mastering ("DMR") technology of converting standard 35 mm or digital format films into films for exhibition on IMAX's LF projection systems.

12. IMAX maintains a multi-million dollar Research and Development program to develop and improve its state of the art projection and film conversion technologies, and it employs dozens of engineers and other technical experts to work on these projects. Among the core technologies that play a key role in IMAX's market competition, and to which IMAX expends significant funds to market and develop, are:

- The IMAX Image Enhancer Technology: IMAX developed an Image Enhancer which is a combination of proprietary hardware and software that allows images from two projectors used in its LF projection system to be superimposed to a sub-pixel resolution, reducing the pixilation artifacts and increasing light levels by up to 100 percent and contrast levels up to 30 percent. This is a critical feature to enable the projector to project images at optimal light levels which result in high resolution images.
- The IMAX 2D to 3D Conversion Technology: This is a software-based post-production process that converts images shot on a regular motion picture camera to 3D using a combination of IMAX proprietary software.
- The IMAX DMR Film Conversion Technology: This proprietary software is a secure re-mastering process for transforming standard Hollywood films (35 mm or digital format) into films for exclusive exhibition in IMAX large format theaters.

(Collectively, "IMAX Image Enhancer Technology", "IMAX 2D to 3D Conversion Technology" and "IMAX DMR Film Conversion Technology" referred to as "IMAX Trade Secrets").

13. The IMAX Trade Secrets are not accessible to the public or any third party through any public channels, and IMAX has never publicly disclosed such proprietary information to the public. These technologies are core, critical components of IMAX's offerings, and the culmination of over four decades of research and development, which clearly have practical applicability and have

brought significant economic benefit to IMAX. In addition, in the competitive marketplace for providing large format and/or 3D imaging technology to the cinema industry, there is great economic benefit to IMAX in this proprietary technical and business information.

14. IMAX has taken extensive measures to protect the IMAX Trade Secrets, including not only contractual measures, but also technological, and procedural measures. IMAX requires employees to sign Employee Confidentiality and Non-Competition Agreements in order to protect and keep confidential the IMAX Trade Secrets. In addition, as per the IMAX Code of Ethics, confidential, trade secret information, such as the IMAX Trade Secrets, is made available by limiting access to such information to those employees who have a need to know in order to do their job, and the access of that information is supervised and monitored by IMAX to ensure that confidentiality is maintained.

15. Based on the foregoing, IMAX alleges that the IMAX Trade Secrets are entitled to protection under the California Uniform Trade Secrets Act. Nevertheless, in the event that it is ultimately determined that some or all of the IMAX Trade Secrets do not qualify for protection under the California Uniform Trade Secrets Act, IMAX further and separately alleges and therefore pleads in the alternative that some or all of the IMAX Trade Secrets nonetheless represent confidential and proprietary information that belongs to IMAX for which GDC owed contractual, statutory and/or common law duties and legal obligations not to acquire, use and/or disclose.

**Theft of IMAX's Trade Secrets By Former Employee Gary Tsui**

16. IMAX employed an individual named Xiaoyu Cui aka Gary Tsui ("Tsui") as a Software Engineer in its Ontario, Canada headquarters from July 22, 1999, until he was terminated on or about November 26, 2009.

17. Tsui's responsibilities at IMAX included, without limitation:

(a) developing proprietary high-performing image processing software and algorithms for LF motion picture production applications and digital cinematic products;

(b) designing and implementing new image processing software products for the advancement of IMAX image processing technology, including re-mastering technology;

(c) developing software that allows for 3D cloning functions and ensures the delivery of excellent 3D quality through IMAX's Live Action 3D conversion process;

(d) developing and improving IMAX's DMR software, which allows conventional films to be converted into LF;

(e) developing and managing version control for all of IMAX's image technology software; and

(f) developing an encryption scheme for the IMAX Image Enhancer, by virtue of which Tsui became extremely knowledgeable as to how the proprietary Image Enhancer technology works.

18. By virtue of his responsibilities and access to other employees, Tsui also gained knowledge of highly confidential and proprietary business information regarding products, pricing and market plans.

19. At the outset of his employment with IMAX, Tsui executed a Confidentiality and Non-Competition Agreement, in which he acknowledged that he would: (a) not disclose IMAX trade secrets and other intellectual property during or after his employment with IMAX; and (b) not compete with IMAX or any of its subsidiaries while employed with IMAX and for a specified period from the conclusion of his employment with IMAX.

20. In August 2008, a delegation from Hangzhou, China visited IMAX's offices in Ontario, Canada for the purpose of conducting due diligence on IMAX's technology in anticipation of IMAX's response to a Request for Proposal to build a

large format 3D theater at a science and technology museum in Hangzhou. During that tour, Tsui acted as a translator for the Hangzhou delegation, which included an individual named Allan Qiang ("Qiang").

21. Months later, Tsui gave notice of his resignation from IMAX on November 2, 2009, but was to continue to work at IMAX to transition his responsibilities through the end of November. On November 24, 2009, IMAX learned that the Hangzhou Project was awarded to Jiangsu Sunway Digital, Inc. ("Sunway"), an entity unknown in the industry at that time, which had submitted a bid 13 percent lower than IMAX's bid.

22. IMAX subsequently learned that Sunway was established on July 2, 2009, *by Tsui and Qiang*, while Tsui was still employed by IMAX. IMAX is informed and believes that it was impossible for Sunway to have independently developed the necessary technology (technology that took IMAX over four decades to create) to complete the Hangzhou Project in the four short months between when the company was formed and when it won the Hangzhou bid. Given the timing and the extensive access to IMAX's trade secrets by Tsui during his employment and during his formation of Sunway, the technology used by Sunway to win the Hangzhou project was, upon information and belief, derived from IMAX's proprietary technology and trade secrets.

23. Given Tsui's obvious misappropriation of IMAX's trade secrets and unlawful competition with IMAX, IMAX terminated Tsui's employment on or about November 26, 2009.

24. After his termination, forensic searches of Tsui's IMAX computer revealed abundant evidence of his creation of Sunway and his rampant use of IMAX's trade secrets for his personal gain. Immediately after his termination from IMAX, IMAX learned that Tsui concealed two computer hard drives in Ontario, then fled to China. Those hard drives, which were later retrieved by Qiang, were

assumed to contain highly confidential and proprietary information relating the IMAX Trade Secrets.

**IMAX Sues Tsui in Canada and China and Uncovers Overwhelming Evidence of Tsui's Theft and Use of IMAX's Trade Secrets.**

25. Shortly after Tsui fled to China, IMAX initiated a lawsuit against Tsui, Qiang and their related companies in Ontario, Canada on December 8, 2009, through which IMAX sought an injunction to: (a) prohibit Tsui from disclosing or using IMAX's confidential and proprietary information; (b) prohibit Tsui from competing with IMAX; and (c) requiring Tsui to preserve all information, documents and other property of IMAX. The Ontario Superior Court of Justice awarded the injunctive relief sought by IMAX in its entirety on December 22, 2009.

26. Tsui ignored the entry of this Order, fled to China, and continued to use the IMAX Trade Secrets in violation of the Order.

27. In fact, in 2012, evidence was uncovered in the Ontario litigation confirming that Tsui was continuing to use the Trade Secrets under a variety of different business names.

28. This evidence indicates that, in early January 2012, Tsui's Sunway business had morphed into a joint venture called "DMAX: Digital MAX" ("DMAX"). Upon information and belief, "DMAX" was renamed "China Giant Screen" after IMAX successfully prosecuted a trademark infringement action against it. That company, however named, uses CFGS which utilizes the stolen Trade Secrets and intended to serve as a competitive alternative to IMAX's large format screen technologies.

29. In addition to DMAX and CFGS, Tsui also founded Beijing Cubic Pictures Technology, Inc., that provides 2D to 3D film conversion using, upon information and belief, the IMAX Trade Secrets.

30. In January 2012, the Ontario Court of Justice found Tsui in contempt of its prior injunction, and again ordered Tsui to stop competing with IMAX, and to

return the company's property, including proprietary and confidential information. Once again, Tsui disregarded this order.

31. Further, based on the overwhelming evidence uncovered in that lawsuit, the Ontario court granted IMAX an "Anton Pillar" Order, a rarely granted remedy that is the equivalent of a criminal search and seizure order. Under this order, Tsui's residences and offices in Ontario were searched in July 2012, and additional evidence was uncovered demonstrating Tsui's theft of the IMAX Trade Secrets, use of those Trade Secrets to compete directly with IMAX while he was still employed with IMAX, and disclosure of those Trade Secrets to third parties for the purpose of unfairly competing with IMAX.[1]

32. On April 30, 2013, a warrant was issued for Tsui's arrest based on his refusal to comply with the court's prior orders, and his continued unlawful use of the IMAX Trade Secrets. If Tsui returns to Canada, he will be immediately apprehended and incarcerated. The Ontario action is to proceed to trial in 2013; although, as part of the Ontario court's contempt order, all of Tsui's defenses have been summarily stricken by the court.

33. Given Tsui's disregard of the Ontario court's orders, and his continued use of the IMAX Trade Secrets in China, IMAX filed a lawsuit against Tsui in Beijing, China on February 16, 2013. Based on evidence provided to the Beijing court, an Evidence Preservation Order was granted by the court, a rare form of relief that provides for broad search and seizure of evidence by court officials.

34. The execution of this order revealed overwhelming evidence of Tsui's theft and continued possession and use of IMAX's Trade Secrets, including numerous CDs that contained highly confidential and proprietary source code used in connection with the IMAX 2D to 3D Conversion Technology and the IMAX DMR Film Conversion Technology.

---

[1] Other materials found on the premises were destroyed intentionally in violation fo the court's order by Tsui's relatives in the presence of law enforcement personnel.

35. IMAX is informed and believes that China Giant Screen has participated in the defense of Tsui in China, who has conceded to the Chinese court that he is the "Chief Engineer" of that company.

**GDC Partners With Tsui to Use IMAX's Trade Secrets in the United States**

36. On its website, www.gdc-tech.com, Defendant GDC represents that it "is currently the largest supplier of digital cinema servers throughout Asia and the second largest provider of digital cinema servers worldwide, serving its customers through offices in the US, Mexico, Spain, Hong Kong, Japan, Singapore, China and India." It claims to deliver and install "digital cinema servers, projection and 3D systems worldwide."

37. In June 2013, IMAX first became aware that GDC had partnered with China Film Group to develop and sell CFGS systems in the United States and internationally. Specifically, GDC has represented the following in recent publicly distributed materials:

(a) "We [GDC] have been selected by the China Film Group, the largest film distributor in China, to provide film mastering and exhibition technologies for the China Film Giant Screen format."

(b) "We [GDC] have also leveraged our relationship with China Film Giant Screen to exhibit content in the China Film Giant Screen large-screen format. The China Film Giant Screen format is one of a few large-screen formats used by Hollywood studios. As of March 31, 2013, China Film Giant Screen had deployed 24 units of our digital cinema servers on their large-screen format systems in China."

(c) "Our [GDC's] close interaction with leaders of the digital cinema industry has allowed us to develop a number of proprietary technologies that have improved the audiovisual experience, enhanced

the security of content delivery, reduced content delivery costs and simplified exhibition, including . . . film mastering and exhibition technologies for China Film Giant Screen, one of a few large-screen formats used by Hollywood blockbusters, in 2012 . . . ."

(d) "We [GDC] also recently entered into contracts for licensing and reselling China Film Giant Screen systems in Asia (excluding China) on an exclusive basis and in the rest of the world on a non-exclusive basis. We expect to be able to derive revenue both from initial equipment sales and sharing of box office revenue for movies in the China Film Giant Screen large-screen format beginning in the second half of 2013 or in 2014 . . . ."

38. In separate materials, GDC markets its ability to provide – specifically in connection with the giant screen format – "unique image and projector alignment technologies" and "unique content mastering technologies." Upon information and belief, these "unique image" and "unique content mastering" technologies refer to IMAX's highly confidential and proprietary DMR Film Conversion Technology. As alleged above, Chinese court officials recovered source code for IMAX's 2D to 3D Conversion Technology and DMR Film Conversion Technology from Tsui in 2013 in connection with the execution of a search and seizure order. In these same materials, GDC also markets its ability to provide "projector alignment technologies" in connection with "giant screen format," which, upon information and belief, refers to IMAX's proprietary and highly confidential Image Enhancer Technology, which serves as a critical feature of IMAX's projection system technology. Further, in these materials, GDC announces its intention to "Become a Leader in the Large Screen Format Market Segment" through, upon information and belief, its relationship with CFGS, using IMAX's Trade Secrets.

39. Given the conclusive evidence of Tsui's theft of IMAX's Trade Secrets, the nature of China Giant Screen's "large screen format" technologies including

CFGS, the fact that Tsui is China Giant Screen's "Chief Engineer," and the impossibly short time to market for CFGS which could not have been achieved but for the theft, IMAX is informed and believes that GDC is now using the IMAX Trade Secrets in the CFGS or large format film technologies that it is now marketing.

40. On June 18, 2013, IMAX sent GDC a letter informing GDC of Tsui's theft of the IMAX Trade Secrets, improper use of the IMAX Trade Secrets, and intentional interference with IMAX's economic relations. IMAX also informed GDC of the lawsuits it filed against Tsui in Canada and China, including the injunction and warrant for Tsui's arrest issued by the Canadian court and the search and seizure order issued by the Chinese court (and the abundance of evidence obtained therefrom), and provided GDC pleadings from both actions. This letter also informed GDC that:

> "It is material and critical that GDC know that its partner, CFGS, has built technology on the basis of confidential and proprietary information and trade secrets wrongfully taken from IMAX by [Tsui,] one of IMAX's former employees, who is now the Chief Engineer at CFGS."

41. To date, GDC has provided no response to this letter, and continues to aggressively market its relationship with CFGS and its ability to exhibit CFGS' large-format and technologies, which undoubtedly are derived from the IMAX Trade Secrets.

## FIRST CAUSE OF ACTION

**(For Violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426, *et seq.*, and Common Law Misappropriation)**

42. IMAX hereby incorporates Paragraphs 1 through 41, inclusive, by reference as though fully set forth herein.

43. IMAX has developed, and is the owner of, the IMAX Trade Secrets. IMAX has at all times owned and possessed the IMAX Trade Secrets.

44. The IMAX Trade Secrets are proprietary to IMAX, are not generally known to the public or others who can obtain economic value from their disclosure or use, and IMAX derives independent economic value from the fact that the IMAX Trade Secrets are not generally known.

45. At all relevant times, IMAX has used and is using regular and reasonable efforts to protect the confidentiality of the IMAX Trade Secrets and is maintaining them as trade secrets. The information in question was a trade secret at the time of the misappropriation.

46. At all relevant times, IMAX has derived an economic benefit and leadership position in its industry by vigilantly protecting the IMAX Trade Secrets and not permitting or allowing such information to be accessed or used by anyone without an express or implied duty and obligation to IMAX to maintain the secrecy thereof. These efforts by IMAX include the confidentiality and non-compete agreements that IMAX requires individuals, including Tsui, to execute upon their employment, as well as the lawsuits IMAX has filed against Tsui in Canada and China in order to protect the IMAX Trade Secrets and maintain their secrecy.

47. IMAX is informed and believes, and thereon alleges, that prior to June 2013, and continuing today, GDC wrongfully acquired, disclosed and/or used the IMAX Trade Secrets, by virtue of its relationship with CFGS and its "Chief Engineer," Tsui, against whom there is overwhelming evidence of theft and continued use of the IMAX Trade Secrets.

48. At the time the IMAX Trade Secrets were misappropriated and/or used, GDC knew that the IMAX Trade Secrets were, in fact, trade secrets, and were owned and protected by IMAX, and/or that GDC acquired the IMAX Trade Secrets improperly by or through people who had a duty to maintain the confidentiality of the IMAX Trade Secrets.

49. The conduct of GDC as alleged herein, constitutes a violation of the California Uniform Trade Secrets Act, California Civil Code section 3426 *et seq*.

50. As a direct and proximate result of GDC's above-described conduct, acts, and omissions, IMAX has suffered and/or will suffer numerous harms, including but not limited to, lost revenues and profits, damaged relations with current and prospective customers, and material and continuing loss of value of its trade secrets.

51. As a direct and proximate result of GDC's above-described conduct, acts, and omissions, Defendants have been unjustly enriched by misappropriating the IMAX Trade Secrets and by using the IMAX Trade Secrets to unfairly compete with IMAX in the large format motion picture industry. Defendants have been able to avoid or significantly minimize the normal costs and expenses associated with launching a new business enterprise in this industry.

52. As a direct and proximate result of GDC's above-described conduct, IMAX has been damaged in an amount to be proven at trial. The misappropriation, acquisition, use and/or disclosure of the IMAX Trade Secrets was a substantial factor in causing IMAX's injury and harm.

53. GDC, by engaging in the conduct alleged herein, has acted intentionally, willfully, and maliciously, and in conscious disregard of IMAX's rights and interests, and with the purpose of injuring IMAX and depriving it of its rights. As a result, IMAX is entitled to an award of exemplary or punitive damages, in an amount to be determined at trial.

54. Pursuant to California Civil Code sections 3426.3 and 3426.4, IMAX also seeks enhanced damages and to recover its attorneys' fees and costs incurred as a result of GDC's misappropriation of its trade secrets.

55. Pursuant to California Civil Code section 3426.2, IMAX seeks permanent injunctive relief to enjoin and restrain GDC's unlawful conduct. GDC's wrongful misappropriation and use of the IMAX Trade Secrets will, unless and until enjoined and restrained by order of this Court, cause great and irreparable injury to IMAX's

business by destroying the confidential and proprietary nature of the IMAX Trade Secrets and making that information available to IMAX's competitors. Injunctive relief is also appropriate to avoid the necessity of a multiplicity of legal proceedings to restrain GDC from further unlawful conduct for which IMAX has no adequate remedy at law.

**<u>SECOND CAUSE OF ACTION</u>**
**(Unjust Enrichment)**

56. IMAX hereby incorporates Paragraphs 1 through 55, inclusive, by reference as though fully set forth herein.

57. GDC was the recipient of proprietary information and valuable trade secrets owned by IMAX. GDC received property belonging to or provided by IMAX.

58. GDC misappropriated and/or used the IMAX Trade Secrets in a way that caused it to receive a valuable benefit through its actions that GDC would not have otherwise received. In this way, GDC profited and benefitted from the receipt and improper use of GDC's proprietary information.

59. As a result of its improper actions, GDC was unjustly enriched at the expense of IMAX and as a benefit to GDC.

60. Under principles of equity and good conscience, GDC should not be permitted to retain the proprietary information and IMAX Trade Secrets, and IMAX should be compensated for the loss of the benefit they provided in an amount to be proven at trial.

**<u>THIRD CAUSE OF ACTION</u>**
**(Violation of Statutory Unfair Competition Law**
**Bus. & Prof. Code §§ 17200 *et seq.*)**

61. IMAX hereby incorporates Paragraphs 1 through 60, inclusive, by reference as though fully set forth herein.

62. By virtue of the misconduct described herein, GDC has engaged in unlawful, unfair and/or fraudulent business acts and practices in violation of California Business and Professions Code sections 17200 et seq.

63. GDC has acted in a way to restrain competition or the free exercise of business activity.

64. GDC's acts were unlawful because they were in violation of the California Uniform Trade Secrets Act, because they involved misappropriation and/or unlawful use of the IMAX Trade Secrets, and because they constitute an unfair attempt to gain a competitive edge against IMAX. Such unlawful restraint on trade is evidence of unfair competition.

65. GDC's conduct is unfair, as the harm to IMAX outweighs the utility of the conduct to GDC. The harm caused by GDC's conduct is immoral, unethical, oppressive, and offends public policy.

66. As a proximate result of such unlawful, unfair and/or fraudulent business acts and practices, IMAX has lost money and property, including its intellectual property, and GDC has enjoyed unlawful profits, in a sum not yet fully ascertained, but well in excess of the jurisdictional limits of this Court. IMAX seeks the remedy of disgorgement and restitution for illicit profits obtained by GDC, from their misappropriation of the IMAX Trade Secrets, and intellectual and other property, and their other unlawful, unfair and/or fraudulent business acts and practices.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, IMAX respectfully prays for relief against GDC as follows:

(a) actual damages in the amount caused by GDC to be proven at trial;

(b) monetary damages in an amount by which GDC was unjustly enriched and will be unjustly enriched;

(c) reasonable royalties for the use of trade secrets pursuant to Civil Code 3426.3(b);

(d) exemplary damages pursuant to Civil Code 3426.3(c);

(e) awarding compensatory and punitive damages in an amount to be determined at trial, with interest, at the maximum amount permitted by law;

(f) attorneys' fees, costs, disbursements in prosecuting this action, as well as interest, to the extent permitted by law;

(g) declaratory and permanent injunctive relief as the Court may deem necessary and proper;

(h) such other and further relief as this Court deems just and proper.

Dated: June 26, 2013

MANATT, PHELPS & PHILLIPS LLP
CHAD S. HUMMEL
SHARI MULROONEY WOLLMAN
ERIN C. WITKOW

By [signature]
*Attorneys for Plaintiff*
IMAX CORPORATION

**DEMAND FOR JURY TRIAL**

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 38(b) and L.R. 38-1, Plaintiff IMAX Corporation hereby demands a trial by jury on all issues triable by a right to a jury trial in the above-captioned action.

Dated: June 26, 2013

MANATT, PHELPS & PHILLIPS LLP
CHAD S. HUMMEL
SHARI MULROONEY WOLLMAN
ERIN C. WITKOW

By [signature]
*Attorneys for Plaintiff*
IMAX CORPORATION

309438329.1